GENENTECH, INC., et al., Plaintiffs,

v.

Otis R. BOWEN, et al., Defendants.

No. Civ. A. 87–605 SSH.

United States District Court,
District of Columbia.

Sept. 18, 1987.

James R. Phelps, Robert A. Dormer, Washington, D.C., Brian C. Cunningham, Patricia J. Kenney, South San Francisco, Cal., for plaintiff Genentech.

Nancy L. Buc, Salem M. Katsh, Washington, D.C., for plaintiff Nordisk.

Robert Poluska, Paul L. Perito, John P. Wintrol, Conan N. Louis, Washington, D.C., for plaintiff/intervenor.

Joel E. Hoffman, Washington, D.C., for Eli Lilly.

Jeffrey N. Gibbs, Washington, D.C., for Ares–Serono.

Jeffrey Hunter Moon, U.S. Atty's. Office, Washington, D.C., for Government.

Fletcher E. Campbell, Jr., Rockville, Md., for FDA.

## MEMORANDUM OPINION

STANLEY S. HARRIS, District Judge.

This matter is before the Court on the separate, but similar, motions of plaintiff Genentech, Inc. (Genentech), intervenor-defendant Ares–Serono, Inc. (Serono), and intervenor-plaintiffs Nordisk Gentofte A/S and Nordisk–U.S.A. (Nordisk) for partial summary judgment. In its complaint, Genentech, the manufacturer and marketer of a synthetic human growth hormone produc-

ed through recombinant DNA technology, alleges that the recent decision of the Food and Drug Administration (FDA), represented in this Court by defendants Otis R. Bowen, Secretary of Health and Human Services, and Frank E. Young, Commissioner of the Food and Drugs Administration, to approve a recombinant DNA human growth hormone product manufactured by intervenor-defendant Eli Lilly and Company (Lilly) violated the Administrative Procedure Act, the Orphan Drug Act, and the Fifth Amendment to the United States Constitution. The pending motions challenge the validity of the FDA's designation, prior to marketing approval, of Lilly's drug as an orphan drug. Upon consideration of the motions, the oppositions thereto, and the entire record, the motions for partial summary judgment are denied.

### Background

This case revolves around certain elements of the FDA's implementation of the Orphan Drug Act, Pub.L. No. 97–414, 96 Stat. 2049 (1983) (codified, as amended, at 21 U.S.C. §§ 360aa–360ee).[1] Accordingly, it is appropriate to begin with a review of the history and purposes of the Orphan Drug Act, as well as the particular circumstances which gave rise to this lawsuit.

#### I. The Orphan Drug Act

As food and drug regulatory statues go, the Orphan Drug Act (the Act) is relatively straightforward and politically uncontroversial. A pharmaceutical company often must spend $80 million or more to develop a single new drug. 128 Cong.Rec. S15307 (daily ed. Dec. 16, 1982) (statement of Sen. Hawkins) (remarks inserted in record). When the potential market for a drug is small—because the number of persons afflicted with the particular disease or condition which the drug treats is relatively small—it may be impossible for the manufacturer to recover its sizable research and development investment, much less realize an acceptable return on that investment. *Id.* The Act is designed to combat the

---

1. The Orphan Drug Act amends the Federal Food, Drug, and Cosmetic Act, ch. 675, 52 Stat. 1040 (1938) (codified, as amended, as 21 U.S.C. Chap. 9).

general unwillingness of pharmaceutical manufacturers to invest in the development of commercial drugs for the treatment of diseases which, although devastating to their victims, afflict too small a proportion of the population to make them commercially viable. *Id.*[2]

■ The Act seeks to encourage the development of "orphan drugs" by reducing the overall financial cost of development, while enhancing the developer's ability to recover that cost through sale of the drug. Specifically, the Act attempts to reduce development costs by streamlining the FDA's approval process for orphan drugs,[3] by providing tax breaks for expenses related to orphan drug development,[4] by authorizing the FDA to assist in funding the clinical testing necessary for approval of an orphan drug,[5] and by creating an Orphan Products Board to coordinate public and private development efforts.[6] The Act seeks to enhance the orphan drug manufacturer's ability to recover his investment by granting the manufacturer seven years of exclusive marketing rights "for such drug for such [rare] disease or condition."[7] A "rare disease or condition" is one which "affects less than 200,000 persons in the United States," or one which "affects more than 200,000 in the United States and for which there is no reasonable expectation that the cost of developing and making available in the United States a drug for such disease or condition will be recovered from sales in the United States of such drug." 21 U.S.C. § 360bb(a)(2).[8]

Qualification for orphan drug benefits occurs in a two-step process. At any phase of the research and development process, a manufacturer who believes its drug will treat a "rare disease or condition" may apply to the FDA for designation as "a drug for a rare disease or condition" (*i.e.*, an orphan drug). 21 U.S.C. § 360bb. Orphan drug designation enables the manufacturer or sponsor to take advantage of the Act's tax benefits, to request pre-ap-

2. *See also, e.g.,* Orphan Drug Act, Pub.L. No. 97–414, § 1(b)(4)–(5), 96 Stat. 2049, 2049 (1983) (Congress' findings); H.R.Rep. No. 840, 97th Cong., 1st Sess. 1, *reprinted in* 1982 U.S. Code Cong. & Admin. News 3577, 3577; 128 Cong. Rec. S15307 (daily ed. Dec. 16, 1982) (statement of Sen. Kennedy) (remarks inserted in record); 128 Cong.Rec. H9678 (daily ed. Dec. 14, 1982) (statement of Rep. Weiss) (remarks inserted in record); *id.* at H9674 (statement of Rep. Waxman); 128 Cong.Rec. S13226–27 (daily ed. Oct. 1, 1982) (statement of Sen. Nunn); *id.* at S13224 (statement of Sen. Kassebaum); *id.* at S13222–23 (statement of Sen. Hatch); 128 Cong.Rec. H7650 (daily ed. Sept. 28, 1982) (statement of Rep. Goodling).

3. *See* 21 U.S.C. § 360aa(a) (orphan drug manufacturer may request from the FDA written recommendations for clinical and non-clinical tests necessary for approval). Nothing in the Act, however, modifies the manufacturer's ultimate responsibility, under 21 U.S.C. § 355, to demonstrate that the drug is both safe and effective. *See* 128 Cong.Rec. H7650 (daily ed. Sept. 28, 1982) (statement of Rep. Ratchford) (remarks inserted in record).

4. *See* 26 U.S.C. §§ 44H, 280C.

5. *See* 21 U.S.C. § 360ee(a) ($4 million is available for each of the fiscal years 1986, 1987, and 1988).

6. *See* 42 U.S.C. § 236.

7. *See* 21 U.S.C. § 360cc(a). Marketing rights may be awarded to another manufacturer if the exclusive marketer consents in writing, or if, after providing the exclusive marketer with notice and an opportunity to submit its views, the FDA determines that the exclusive marketer is incapable of fully supplying the market. 21 U.S.C. § 360cc(b).

8. As originally enacted, the Act required a showing of financial infeasibility before orphan drug benefits were made available, regardless of the size of the potential patient population. *See* Pub.L. No. 97–414, § 2(a), 96 Stat. 2049, 2050 (1983). However, in 1984, Congress amended the Act to include the present presumption that all diseases afflicting fewer than 200,000 people in the United States require the benefits of orphan drug classification. *See* Health Promotion and Disease Prevention Amendments of 1984, Pub.L. No. 98–551, § 4, 98 Stat. 2815, 2817. In doing so, Congress accepted the arguments of the FDA and the Department of the Treasury that the cost incurred in making such a showing was, in itself, a significant disincentive to seeking orphan drug benefits for drugs related to diseases affecting less than 200,000 persons, over the arguments of the Office of Management and Budget that such a rule would enable manufacturers to reap benefits for drugs that could be developed profitably without them. *See* 130 Cong.Rec. S14253–54, S14255 (daily ed. Oct. 11, 1984) (statement of Sen. Hatch); *id.* at S14255 (statement of Sen. Kassebaum).

proval clinical testing recommendations, and to request financial assistance from the FDA in conducting the necessary clinical investigations. However, manufacturers receiving orphan drug designation must consent to limited public disclosure of the designation by the FDA, 21 U.S.C. § 360bb(b), and may be asked by the FDA to include in the drug's clinical testing, under an "open protocol" method, persons presently suffering from the rare disease. 21 U.S.C. § 360dd. Although the Act does not limit the number of drugs that may be designated for treatment of a particular rare disease, *see* 21 U.S.C. § 360bb, the FDA's present policy is to not consider requests for orphan drug designation made after that drug has received full FDA marketing approval for that particular disease. *See* Policy of Eligibility of Drugs for Orphan Designation, 51 Fed.Reg. 4505, 4505 (1986).

■ While any number of drugs may receive the development-phase benefits of the Act, only one manufacturer may receive exclusive marketing rights. This post-development benefit is reserved for the first manufacturer to receive full FDA approval of its drug as safe and effective for commercial sale. The Act provides, in pertinent part:

[I]f the [FDA] ... approves an application ... for a drug designated under section 360bb of this title for a rare disease or condition, the [FDA] may not approve another application ... for such drug for such disease or condition for a person who is not the holder of such approved application ... until the expiration of seven years from the date of approval of the approved application....

21 U.S.C. § 360cc(a).[9] The FDA may authorize another manufacturer to produce "such drug for such disease or condition" only if the exclusive marketer consents in writing or is incapable of providing sufficient quantities of the drug. *See supra* note 7.

As originally enacted, the Act limited the availability of exclusive marketing rights to drugs "for which a United States Letter of Patent may not be issued...." *See* Pub.L. No. 97–414, § 2(a), 96 Stat. 2049, 2050 (1983). In considering the proposed legislation, the House Committee on Energy and Commerce found that many potential orphan drugs are not patentable, and stated: "In order to provide some incentive for the development of these particular orphan drugs, the Committee's bill includes an exclusive marketing right for the sponsor of such a drug." H.R.Rep. 840, 97th Cong., 2d Sess. 11, *reprinted in* 1982 U.S. Code Cong. & Admin. News 3577, 3583; *see also* 128 Cong.Rec. S13224 (daily ed. Oct. 1, 1982) (statement of Sen. Kassebaum) (Act "attempts to address the problems created when a promising drug treatment is not patentable by providing a 7-year exclusive marketing right for the sponsor of the drug.") Thus, the exclusivity provision of the Act was designed to complement the patent laws, filling gaps which might leave orphan drug manufacturers unprotected.

In 1985, Congress amended the Act to delete the non-patentability criterion in the exclusivity provision. *See* Orphan Drug Amendments of 1985, Pub.L. No. 99–91, § 2, 99 Stat. 387, 387. The most extensive discussion of the purposes of the Act's exclusivity provision appears in the report prepared by the House Committee on Energy and Commerce to accompany the 1985 amendments to the Act. H.R. Rep. 153, 99th Cong., 1st Sess., *reprinted in* 1985 U.S. Code Cong. & Admin. News 301. The Committee began by noting that in the two-and-one-half years since its passage, the Act had "stimulated substantial new commitments" to the development of orphan drugs. *Id.* at 2, 1985 U.S.Code Cong. & Admin.News at 301. In discussing exclusivity, the Committee stated: "The purpose of the seven year period is to allow the sponsor of the orphan drug to recoup

9. Exclusivity is also available for antibiotic drugs which receive FDA certification under 21 U.S.C. § 357, and biological products for which a license is issued under 42 U.S.C. § 262. *See* 21 U.S.C. § 360bb(a)(2), (3). For the purposes of this case, only the application of the Act to drugs receiving approval through the "new drug" application process of 21 U.S.C. § 355 is relevant.

the cost of development by capturing all revenues from the sale of the drug for the rare disease." *Id.* at 3, 1985 U.S.Code Cong. & Admin.News at 303.

The Committee's expectation when it drafted the original provision in 1983 had been that exclusivity "would be used primarily by orphan drugs that [could] not get product patents." *Id.* [10] However, experience under the Act demonstrated that reliance on the incentives of patent protection for all patentable orphan drugs would be insufficient. First, many patents expire before completion of the clinical testing necessary for FDA marketing approval. *Id.* [11] Second, in many cases the product patent on a drug is held by an individual or company other than the one that intends to test the drug for use against a rare disease, and prior academic publication in the area precludes issuance of a use patent. *Id.* Accordingly, the fact that a product patent has been issued does not always ensure that a manufacturer will have a sufficient incentive to apply for permission to market the drug as an orphan drug.

In expanding the exclusivity provision to cover both patented and unpatented orphan drugs, the Committee noted that the provision would only benefit the sponsors of drugs with less than seven years of product patent protection available, and explained the difference between exclusivity under the Act and traditional patent protection. First, traditional patents generally offer much broader protection than orphan drug exclusivity, which is limited to treatment of a particular disease. *Id.* at 5, 1985 U.S. Code Cong. & Admin. News at 305.

Second, while the inviolability of a patent is limited only by the holder's ability to enforce his rights in court, orphan drug exclusivity exists only so long as the sponsor adequately supplies the market. *Id.*

The Committee expressed its desire that elimination of the patentability distinction, while probably still not making orphan drugs profitable business ventures, would strengthen development by providing greater certainty to potential orphan drug sponsors.

> The Act and this bill do attempt to reduce the disincentives for their development and give drug company sponsors some certainty as to the drug approval process at FDA and the market conditions they will face upon approval. The Committee hopes and anticipates that the amendment ... will encourage the development of new orphan drugs for use in previously untreated rare diseases.

*Id.* at 6–7, 1985 U.S. Code Cong. & Admin. News at 306. In floor debates, the exclusivity amendment either went undiscussed or was referred to as merely an administrative correction. *See* 131 Cong.Rec. S7025 (daily ed. May 23, 1985) (statement of Sen. Hatch) (a "small change" to eliminate "administrative difficulty").

In summary, a review of the legislative history reveals bipartisan support for both the purpose of the Orphan Drug Act—the development of safe and effective drugs for persons suffering from diseases so rare that ordinary market forces would not promote development, and the means of achieving the Act's goal—the creation of

**10.** Many drugs, once approved for sale, are ineligible for patent protection because to receive a patent an applicant must demonstrate that the invention is neither known nor obvious to others. The active ingredient of a drug may be patentable under either a "product patent" or a "use patent." "As a general rule, if the active ingredient in a drug exists in nature or is not sufficiently different from other existing active ingredients that it is known or obvious, then it cannot be the subject of a product patent. As a general rule, if the use of an active ingredient in a particular disease is obvious or is known because of literature published before a patent application is submitted to the Patent Office, then it cannot be the subject of a use patent." H.R.Rep. 153, 99th Cong., 1st Sess. 3 n. 1, *re-*printed in 1985 U.S. Code Cong. & Admin. News 301, 302.

**11.** Prior to the 1985 amendments, the FDA already had taken steps to address this problem by interpreting the Act to permit marketing exclusivity when the orphan drug's product patent had expired by the time the FDA approved the drug for commercial sale. However when a short period of patent protection remained, the FDA was placed in the unacceptable position of delaying approval until the patent expired. H.R.Rep. 153, 99th Cong., 1st Sess. 4, *reprinted in* 1985 U.S. Code Cong. & Admin. News 301, 304.

an economic atmosphere that would lead pharmaceutical manufacturers to invest in developing those drugs.

## II.  Factual Background

Human growth hormone (hGH) is a protein naturally produced and secreted by the human pituitary gland.  In some children, between 6,000 and 15,000 in the United States, the pituitary gland does not produce enough hGH, resulting in stunted growth.  Since 1958, the condition had been treated by supplementing a patient's natural hGH with hGH derived from the pituitary glands of human cadavers.[12]  However, in 1985, use of pituitary-derived hGH was effectively eliminated by the discovery that three hGH patients who had been treated with hGH provided by NHPP had developed Creutzfeldt–Jakob Disease, an extremely rare but fatal condition, apparently due to exposure to a pathogen transmitted by the pituitary-derived hGH.  Although no cases of Creutzfeldt–Jakob Disease have ever been linked to hGH distributed by Serono or KabiVitrum, neither has distributed pituitary-derived hGH in the United States since 1985.[13]

On October 17, 1985, the FDA granted Genentech, a pharmaceutical developer that specializes in the use of biotechnology (popularly known as "gene splicing"), marketing approval for a human growth product known commercially as Protropin.  Genen-

tech's product differs from pituitary-derived hGH in two important respects.  First, it is synthesized through a recombinant DNA process utilizing *E. coli* bacteria, rather than produced in a human gland.[14]  Second, Genentech's "r-hGH" product includes an amino acid group not commonly found in pituitary-derived hGH.[15]  In terms of chemical structure, Genentech's r-hGH has the same sequence of 191 amino acids found in hGH, with an additional methionine amino acid group attached to one end of the molecule.  Because Genentech's drug apparently does not present the risk of Creutzfeldt–Jakob Disease associated with pituitary-derived hGH, its approval in 1985 filled an important health need.  On December 12, 1985, the FDA designated Protropin as an orphan drug, thus granting Genentech marketing exclusivity, pursuant to 21 U.S.C. § 360cc, until December 12, 1992.  Genentech estimates that it invested approximately $45 million developing its r-hGH product.

On June 12, 1986, the FDA designated an r-hGH drug developed by intervenor-defendant Lilly as an orphan drug for the treatment of human growth hormone deficiency.  Unlike Genentech's r-hGH product, the chemical structure of Lilly's product is identical to that of natural, pituitary-derived hGH; that is, Lilly's drug does not contain the additional methionyl group found in Protropin.[16]  On October 15, 1986,

---

**12.**  In 1963, the National Institutes of Health's National Hormone and Pituitary Program (NHPP) began distributing pituitary-derived hGH to patients in the United States, under an investigational new drug exemption.  In 1979, intervenor-defendant Serono and KabiVitrum each acquired marketing rights for pituitary-derived hGH under approved New Drug Applications (NDAs) and began distributing hGH in the United States.

**13.**  Although Serono's and KabiVitrum's NDAs were not cancelled by the FDA pursuant to 21 U.S.C. § 355(e), it is not clear to the Court whether those companies' withdrawals were purely voluntary, or whether there was a degree of informal compulsion exerted by the FDA.  It is undisputed, however, that the withdrawals were *occasioned* by the linking of Creutzfeldt–Jakob Disease to pituitary-derived hGH, and that they effectively eliminated the supply of supplemental hGH in this country.

**14.**  DNA stands for deoxyribonucleic acid.  For a brief explanation of the recombinant DNA process, *see* Note, *The Rutabaga That Ate Pittsburgh: Federal Regulation of Free Release Biotechnology,* 72 Va.L.Rev. 1529, 1531–33 (1986).  For a more detailed explanation, *see* Grobstein, *The Recombinant–DNA Debate,* Sci.Am., July 1977, at 22–29.

**15.**  Large proteins, such as human growth hormone, are known as polypeptides, and consist of chains of different amino acid groups linked end to end.  The sequence of the amino acids making up the chain distinguishes one type of protein from another.

**16.**  Genentech, Serono, intervenor-plaintiff Nordisk, and at least one other manufacturer also have developed methionyl-free r-hGH products.  Requests for orphan drug designation were submitted by Genentech, Serono, and Nordisk to the FDA during 1986.

Lilly submitted to the FDA a New Drug Application (NDA) for its r-hGH product, seeking permission to market the drug commercially.

On November 3, 1986, Genentech submitted a "citizen petition" to the FDA. In it, Genentech took the position that Lilly's drug was, for the purposes of the Orphan Drug Act, the same as Protropin and therefore ineligible for marketing approval until 1992. Genentech asked the FDA to implement procedures under which the manufacturer of an orphan drug with marketing exclusivity would receive notice of, and the opportunity to contest, another manufacturer's claim that its drug was "different" for the purposes of Orphan Drug Act protection. Genentech also requested an administrative stay of approval of any new r-hGH products until Genentech received the proposed procedural opportunities, as well as an opportunity to seek judicial relief.

When Genentech learned that the FDA was preparing to approve the NDA for Lilly's methionyl-free r-hGH product, known commercially as Humatrope, Genentech sought an emergency stay from the FDA. When that request was denied, Genentech filed suit in this Court on March 6, 1987, seeking temporary, preliminary, and permanent injunctive relief, in addition to a declaratory judgment that the FDA's application of the Orphan Drug Act violated Genentech's statutory and constitutional rights.

The Court denied the plaintiff's request for a temporary restraining order on March 6, 1987.[17] That same day, the FDA formally responded to Genentech's citizen petition, denying the requests for implementation of new procedures and for a stay. The FDA also informed Genentech and Serono by letters that their methionyl-free r-hGH products had been designated orphan drugs.[18] On March 8, the FDA approved Lilly's NDA for Humatrope, thereby authorizing Lilly to market the drug commercially and triggering the orphan drug exclusivity provision of 21 U.S.C. § 360cc.[19] Genentech and Nordisk have submitted NDAs for methionyl-free r-hGH products, but the FDA has not yet ruled on either NDA.

### Discussion

**I.  Issues of Procedure and Justiciability**

In opposing the motions for partial summary judgment, Lilly raises several threshold arguments relating to procedure and justiciability, rather than the substantive merits of the underlying claims. The Court finds none of them dispositive.

**A.  *Claims Within the Scope of the Litigation***

■ Lilly argues that Genentech is not entitled to summary judgment because its motion is based on a claim not found in the complaint. While Lilly concedes that count V of Genentech's complaint challenges the validity of Humatrope's designation as an orphan drug, it points out that the rationale advanced by Genentech for this argument

**17.** At the TRO hearing on March 6, a hearing on plaintiff's motion for a preliminary injunction was scheduled for March 26, 1987. Opposition briefs for intervenor-defendants Lilly and Serono were filed on March 20, and for the federal defendants on March 24. On March 24, Genentech moved to extend the date for filing its reply brief, as well as the date for hearing argument on the preliminary injunction motion, indefinitely while plaintiff studied the administrative record filed by the FDA. The Court granted that motion on March 25. Considering the length of time that has passed, and the volume of water that has passed under the proverbial bridge since plaintiff's motion for a preliminary injunction was placed in judicial suspended animation, the Court has concluded that the pending preliminary injunction motion should be denied without prejudice to plaintiff's right to

seek such relief in the future. This will allow plaintiff to argue any legal theory supported in the record, without being confined by the standards applicable to reply memoranda, and will ensure that the defendants have an adequate opportunity to respond to plaintiff's arguments.

**18.** In response to the FDA's approval of the Humatrope NDA, Genentech amended its complaint to reflect the changed factual circumstances. All references in this opinion are to the amended complaint.

**19.** The FDA has requested additional information from Nordisk regarding its request for orphan drug designation. Consequently, the FDA has not yet issued a final decision on Nordisk's request.

was that Humatrope and Protropin are the "same" drug for the purposes of the Orphan Drug Act, not that Humatrope and pituitary-derived hGH are the same drug. Consequently, Lilly argues that Genentech should now, as "a matter of basic fairness," be estopped from ever seeking to invalidate Humatrope's designation on the ground that Humatrope and pituitary-derived hGH are the same drug. The Court disagrees.

■ Genentech bases its motion on information acquired through discovery (*i.e.*, review of the administrative record relating to approval of the Humatrope NDA). That the basis for Genentech's claims would continue to evolve as relevant information was unearthed in discovery is plainly envisioned by the Federal Rules of Civil Procedure. As the Supreme Court stated in *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957):

> [T]he Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. * * * Such simplified "notice pleading" is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues. Following the simple guide of Rule 8(f) that "all pleadings shall be construed as to do substantial justice," we have no doubt that petitioners' complaint adequately set forth a claim and gave the respondents fair notice of its basis. The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that

the purpose of pleading is to facilitate a proper decision on the merits.

*Id.* at 47–48, 78 S.Ct. at 103 (footnote omitted). Lilly makes no argument that it has been prejudiced in its ability to respond to Genentech's revised rationale for its claim that Humatrope's orphan drug designation was improper. Lilly requested—and was given—an enlargement of time to file its opposition to Genentech's motion for partial summary judgment. Accordingly, the Court can find no basis for frustrating Genentech's efforts to have the Court decide this case according to the facts as they are revealed in the administrative record.[20]

### B. *Ripeness*

■ Lilly also argues that the FDA's designation of Humatrope as an orphan drug is not yet ripe for judicial review because neither Genentech, Serono, nor Nordisk has experienced a negative impact by virtue of the designation. The assertion that Lilly's entitlement to the pre-approval benefits available under the Act (such as a tax break for development expenses) presents no legally cognizable injury is not challenged. The parties disagree, however, on the implications of the FDA's approval of the Humatrope NDA and Lilly's consequent right to seven years of marketing exclusivity. Lilly argues that none of the moving parties will suffer a cognizable injury until the FDA rejects an NDA on the basis of Humatrope's orphan drug exclusivity (at this time, Genentech and Nordisk have NDAs for methionyl-free r-hGH pending before the FDA). Genentech, Nordisk, and Serono respond that the FDA's designation constitutes "final agency action" which has had significant financial effects on their day-to-day operations.

"The law of ripeness, once a tangle of special rules and legalistic distinctions, is

---

**20.** Similarly, the Court rejects Lilly's argument that intervenors Serono and Nordisk may not challenge Humatrope's designation on the ground that Humatrope is the same as pituitary-derived hGH. Not only is the claim within the scope of the litigation, but there is no basis for Lilly's argument that the intervenors may not raise claims not raised by Genentech. Indeed, providing an opportunity to litigate claims not adequately raised by the parties is one of the purposes of intervention. *See* Fed.R.Civ.P. 24;

*see also, e.g., Stewart–Warner Corp. v. Westinghouse Electric Corp.*, 325 F.2d 822, 827 (2d Cir. 1963) ("The whole tenor and framework of the Rules of Civil Procedure preclude application of a standard which strictly limits the intervenor to those defenses and counterclaims which the original defendant could himself have interposed"). Moreover, Lilly was presented with opportunities to challenge the scope of both Nordisk's complaint and Serono's cross-claim and failed to object.

now very much a matter of practical common sense." *Continental Air Lines, Inc. v. CAB,* 522 F.2d 107, 124 (D.C.Cir.1974); *see also, e.g., Ciba–Geigy Corp. v. United States Environmental Protection Agency,* 801 F.2d 430, 434 (D.C.Cir.1986) (determination turns on "pragmatic balancing" of interests, rather than "nice legal distinctions"). When, as here, the Court is asked to review an administrative decision, the analytical framework is provided by *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). In *Abbott Laboratories,* the Supreme Court prescribed two levels of inquiry: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." 387 U.S. at 149, 87 S.Ct. at 1515; *see also, e.g., Office of Communication of the United Church of Christ v. FCC,* 826 F.2d 101, 104 (D.C.Cir.1987). Application of both the "fitness" standard and the "hardship" standard to the circumstances of this case indicates that movants' challenges to the Humatrope designation are indeed ripe for review.

The "fitness" determination calls on the Court to determine "whether the agency's position is merely tentative or, on the other hand, whether the agency views its deliberative process as sufficiently final to demand compliance with its announced position." *Ciba–Geigy,* 801 F.2d at 436. There is no question that the administrative decision at issue here—the FDA's designation of Humatrope as an orphan drug—is final and no longer a subject of review at the agency. In notifying Serono of the orphan drug designation of Serono's methionyl-free r-hGH product (known as Saizen), the FDA informed Serono that if an NDA for another natural sequence hGH drug was approved before an NDA for Saizen (as Humatrope subsequently was), Serono could overcome the exclusivity of that first-approved drug only by providing sufficient data to demonstrate the clinical superiority of Saizen.[21] Thus, Serono, in preparing an NDA for Saizen, must now comply with additional requirements imposed as a result of the Humatrope designation. Moreover, the FDA insists that the designation is proper and does not indicate that any additional review will occur at the agency level. "Where, as here, the agency has stated that the action in question *governs and will continue to govern* its decisions, such action must be viewed as final in our analysis of ripeness." *Better Government Ass'n v. Department of State,* 780 F.2d 86, 93 (D.C.Cir.1986) (emphasis in original) (footnotes omitted).

Another element of the "fitness" inquiry is a consideration of whether the issue in dispute is to be resolved as a matter of law, or whether the Court will be called on to resolve factual disputes properly left to the agency. *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515–16; *Alascom, Inc. v. FCC,* 727 F.2d 1212, 1217 (D.C.Cir.1984). The claims at issue here do not involve factual disputes, but rather require the Court to construe the meaning of statutory language and published FDA policy. Accordingly, the Court finds the movants' challenge to Humatrope's orphan drug designation to be fit for judicial review.

In approaching the "hardship" inquiry, the Court must ask whether the agency's position has a " 'direct and immediate ... effect on the day-to-day business' of the complaining parties." *F.T.C. v. Standard Oil Co.,* 449 U.S. 232, 239, 101 S.Ct. 488, 493, 66 L.Ed.2d 416 (1980) (quoting *Abbott Laboratories,* 387 U.S. at 152, 87 S.Ct. at 1517); *see also United States v. Storer Broadcasting Co.,* 351 U.S. 192, 199–200, 76 S.Ct. 763, 768–69, 100 L.Ed. 1081 (1956); *Ciba–Geigy,* 801 F.2d at 436; *Better Government Ass'n,* 780 F.2d at 92. Movants present compelling evidence that the FDA's designation of Humatrope, coupled with the subsequent NDA approval, will have a significant impact on their day-to-

---

**21.** On the same day, March 6, 1987, the FDA sent a similar letter to Genentech, notifying plaintiff that its methionyl-free r-hGH drug (Protropin II) had been designated an orphan drug. However, for no apparent reason, the letter to Genentech did not state, as did the letter to Serono, that Genentech could overcome the exclusivity of an earlier-approved drug by demonstrating clinical superiority. That opportunity was extended to Genentech on July 10, 1987, in a letter from the FDA's Director of the Office of Orphan Products Development.

day research and development efforts. It is undisputed that the costs of developing and gaining marketing approval for the sort of drugs involved here run into the tens of millions of dollars. If Humatrope's orphan drug designation and approval stand, 21 U.S.C. § 360cc(a) will bar for seven years approval of drugs being developed by movants. Accordingly, they find themselves locked in a dilemma: either continue to pour funding into drugs which, regardless of their safety and efficacy, may be barred from the marketplace, or accept the FDA's designation of Humatrope, cut their losses, and forego what could be a successful legal challenge. Such dilemmas are indicative of ripe disputes. *See, e.g., Abbott Laboratories,* 387 U.S. at 152, 87 S.Ct. at 1517; *National Latino Media Coalition v. FCC,* 816 F.2d 785, 790 (D.C.Cir.1987).[22]

Lilly's contention that no hardship will attach to Humatrope's designation until another NDA is formally denied on that basis is without merit. As discussed above, the designation is presently having, and will continue to have, a concrete effect on movants' day-to-day structuring of their businesses. The case law plainly indicates that such agency decisions may be reviewable even though not yet officially enforced. *See Alascom,* 727 F.2d at 1217; *Continental Air Lines,* 522 F.2d at 124–25. Although Lilly makes much of the fact that Serono has not yet submitted an NDA for Saizen, it is undisputed that the FDA has notified Serono that a Saizen NDA must be accompanied by data demonstrating clinical superiority over Humatrope, a costly and

possibly unsustainable burden that is directly attributable to the challenged Humatrope designation. This imposition of additional responsibilities amply demonstrates the tangible impact of FDA's decision on Serono. *See Ciba–Geigy,* 801 F.2d at 436. Accordingly, the Court finds that both prongs of the *Abbott Laboratories* ripeness standard are satisfied with respect to the Humatrope orphan drug designation.

The Court reaches a different conclusion with respect to Serono's challenge to the orphan drug designation of Genentech's methionyl r-hGH Protropin. Although the Court's "fitness" discussion with respect to the Humatrope designation is equally applicable to the Protropin designation, no party has demonstrated any harm flowing from the Protropin designation. Unlike the Humatrope designation, which negatively affects the efforts of Genentech, Serono, and Nordisk to gain marketing approval for their methionyl-free r-hGH drugs, the Protropin designation (construed by the FDA to bar approval only of other methionyl r-hGH drugs) is not affecting the development efforts of any of the parties because Serono, Nordisk, and Lilly are not seeking to market methionyl r-hGH.[23] Accordingly, the Court finds that the "hardship" prong of the *Abbott Laboratories* test is not satisfied with respect to the Protropin designation.[24] Of course, the situation would be different if the FDA were to adopt, either on its own volition or as a result of this litigation, Genentech's position that Protropin's orphan drug exclusivity extends to methionyl-free r-hGH products.

**22.** While the mere possibility of financial losses may not be sufficient to establish "hardship," when compliance with the agency's decision is certain to impose costs that would not be incurred if litigation were successful, financial impact is sufficient. *Abbott Laboratories,* 387 U.S. at 153–54, 87 S.Ct. at 1518; *Ciba–Geigy,* 801 F.2d at 438–39.

**23.** In a reversal of position, Lilly, after arguing early in its opposition brief that the Humatrope designation was not yet ripe for review, joins Serono's motion to invalidate the Protropin designation at the end of the same brief. Lilly makes no effort to harmonize its conflicting positions on this aspect of the ripeness issue.

**24.** Although the parties generally have addressed the justiciability issue in terms of the ripeness doctrine, this case appears to present, as the FDA seems to suggest, a situation where the issue is equally amenable to characterization as a standing problem. The choice of terms has no substantive effect because the Court would find that Serono, Nordisk, and Lilly lack standing to challenge the Protropin designation inasmuch as none has suffered a legally cognizable injury "fairly traceable" to the designation which is "likely to be redressed" through invalidation. *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).

## C. *Subject Matter Jurisdiction*

█ In an extension of its argument that movants may only challenge the Humatrope designation if, and when, their NDAs are denied by the FDA, Lilly argues that this Court lacks subject matter jurisdiction over movants' challenges. Lilly relies on 21 U.S.C. § 355(h), which vests the federal courts of appeals with jurisdiction over appeals "from an order of the Secretary refusing or withdrawing approval of [a new drug] application under this section." However, as explained above, the Court finds that movants have standing to challenge the Humatrope designation prior to a ruling on their NDAs. The Supreme Court has recognized that manufacturers without NDAs pending may be sufficiently affected by FDA decisions regarding the "new drug" status of a product to support a district court action under the Administrative Procedure Act, though not an appeal to the court of appeals. *See Weinberger v. Hynson, Westcott & Dunning,* 412 U.S. 609, 627, 93 S.Ct. 2469, 2482, 37 L.Ed.2d 207 (1973).

Moreover, it is unlikely that a court of appeals would have jurisdiction under 21 U.S.C. § 355(h) to review the validity of the Humatrope designation. Subsection (d) of 21 U.S.C. § 355 enumerates seven grounds for denying a new drug application, and subsection (h) limits the courts of appeals' direct review jurisdiction to denials "under this subsection." A denial based on Humatrope's orphan drug exclusivity would be based on 21 U.S.C. § 360cc(a) (which is silent on the matter of judicial review), not on a ground enumerated in 21 U.S.C. § 355(d). Given the courts' narrow construction of jurisdiction under 21 U.S.C. § 355(h), *see Weinberger v. Bentex Pharmaceuticals, Inc.,* 412 U.S. 645, 651, 93 S.Ct. 2488, 2493, 37 L.Ed.2d 235 (1973); *Cutler v. Hayes,* 818 F.2d 879, 887 n. 61 (D.C.Cir.1987), it is likely that movants would be rebuffed if they attempted to challenge the Humatrope designation in a court of appeals. "Agency action taken under sections [of the Food, Drug, and Cosmetic Act] silent [on judicial review] are directly reviewable in a district court under some appropriate head of its jurisdiction,

for courts of appeals have only such jurisdiction as Congress has chosen to confer upon them." *Cutler,* 818 F.2d at 887 n. 61. Accordingly, the Court holds that it has jurisdiction to entertain movants' challenge to the Humatrope designation.

## II. Validity of the Humatrope Designation

█ Movants contend that Humatrope's orphan drug designation violated both the Orphan Drug Act and the FDA's binding regulations implementing the Act. Their argument is based on the contention that Humatrope and pituitary-derived hGH are the same drug. In light of the peculiar facts of this case, the Court cannot accept movants' contention, and therefore must uphold the Humatrope designation.

The dispute presented here involves the proper application of 21 U.S.C. § 360bb(a), the section of the Act governing orphan drug designations, which provides, in relevant part:

(1) The manufacturer or the sponsor of a drug may request the Secretary to designate the drug as a drug for a rare disease or condition. If the Secretary finds that a drug for which a request is submitted under this subsection is being or will be investigated for a rare disease or condition and—

(A) if an application for such drug is approved under section 355 of this title,

\* \* \* \* \* \*

the approval ... would be for use of such disease or condition, the Secretary shall designate the drug as a drug for such disease or condition.

Movants read this section as requiring that the orphan drug designation of a particular drug occur prior to approval of an NDA for that drug. They then argue that the approval of NDAs for pituitary-derived hGH in the 1970's precluded the orphan drug designation of Humatrope in 1986. Assuming, without deciding, that movants' construction of § 360bb(a) is correct, the Court rejects their argument in this case because it is plain that Humatrope and pituitary-de-

rived hGH are not the same drug for the purposes of § 360bb(a).

A review of the Act's legislative history, as all of the parties would agree, sheds no direct light on the question of how broadly or narrowly the word "drug" should be construed in § 360bb(a). The relevant committee reports and floor debates reveal broad, bipartisan support for the noble goal of providing treatment for the presently untreated, but do not evidence any focused consideration of important, but politically tiresome, details like the issue presented here. Instead, Congress directed that the FDA "shall by regulation promulgate procedures for the implementation" of § 360bb(a). Unfortunately, the FDA has not, in the four years since passage of the Act, proposed any regulations defining "drug" for the purposes of § 360bb(a). Thus, the Court—lacking either a legislative or administrative pronouncement—is left to apply the Act's broad policy objectives to the unique situation at hand. *E.g., Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979); *Automotive Parts Rebuilders Ass'n v. EPA*, 720 F.2d 142, 159 n. 66 (D.C.Cir.1983).

Two related aspects of this particular case convince the Court that if Congress had been presented with the facts of this case, it would have considered Humatrope and pituitary-derived hGH different drugs for the purposes of § 360bb(a). First, Humatrope, by virtue of its synthetic origin, does not present the danger of contamination with the Creutzfeldt–Jakob prion that is associated with hGH obtained from human cadavers. While movants are correct in noting that none of the reported cases of Creutzfeldt–Jakob Disease has been linked to hGH marketed under the approved NDAs held by Serono and Kabi, it is also true that so little is known about the contamination process that no manufacturer can warrant that its product is free from contamination. Thus, any pituitary-derived hGH product presents a risk (albeit unquantifiable) of lethal side effects not associated with r-hGH products such as Protropin and Humatrope.[25]

Second, the industry's response to the linking of Creutzfeldt–Jakob Disease to pituitary-derived hGh—withdrawal from the United States market—meant that regardless of the status of the Serono and Kabi NDAs, methionyl-free hGh would not be available to hGH–deficient children in this country. The legislative history is replete with references to the fundamental need to provide treatment for presently untreated patients; the fact that NDAs for pituitary-derived hGh were technically still valid would not have convinced Congress that growth hormone deficiency was not a condition in need of new treatments. One need only imagine a world without methionyl r-hGH (plaintiff's Protropin) to appreciate the unacceptable ramifications of movants' argument when applied to this case. Without Protropin, children in need of supplemental hGH would go without treatment, while movants offered assurances that no additional orphan drug designations were necessary because valid, but unused, NDAs remained in effect. In enacting the Orphan Drug Act, Congress clearly focused on the availability of treatments, not the existence of prior NDAs. *See, e.g.,* 131 Cong.Rec. S6243 (daily ed. May 15, 1985) (statement of Sen. Kennedy) (referring to need for orphan drugs to be "commercially available"); 128 Cong.Rec. S15307 (daily ed. Dec. 16, 1982) (statement of Sen. Hawkins) (same); *cf.* 21 U.S.C. § 360cc(b)(1) (FDA may approve additional NDAs if holder of exclusive marketing rights is unable to supply the entire market). The Court is satisfied that Congress would have considered Humatrope sufficiently "different" to justify orphan drug designa-

---

**25.** Movants place great emphasis on statements made by Lilly and by the FDA officials describing the common chemical characteristics of pituitary-derived hGH and methionyl-free r-hGH. It is clear from the record that the close similarity of the two drugs allowed the FDA to focus its evaluation of the Humatrope NDA. Neverthe-

less, the Court does not read the FDA's comments to indicate that the two drugs were identical in every relevant respect. Lilly's apparent concession in its answer that "all methionyl-free growth hormone products are the same drug" is not relevant to the legal basis for a decision made not by Lilly, but rather by the FDA.

tion.[26]

Nor did the Humatrope designation violate published FDA policy. Movants contend that under the FDA's "Policy of Eligibility of Drugs for Orphan Designation," published in the Federal Register on February 5, 1986, the FDA could not grant an orphan drug designation to Humatrope because the designation was submitted after the FDA had approved an NDA for "that drug" (*i.e.*, pituitary-derived hGH). Notwithstanding the FDA's argument that its policy was designed to apply only to situations in which a sponsor attempted to secure orphan drug benefits after, rather than before, approval of that product for marketing, and the deference due an agency's interpretation of its own regulations, *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), movants' argument must be rejected because the Court has concluded that Humatrope and pituitary-derived hGH are not the same drug.

### Conclusion

In finding that Humatrope and pituitary-derived hGH are different drugs for the purposes of orphan drug designation under 21 U.S.C. § 360bb, and that therefore the Humatrope designation is valid, the Court's holding is narrow and confined to the particular facts of this case. The Court expresses no opinion on the still-pending issue of whether Protropin's orphan drug exclusivity barred approval of Humatrope, and, in particular, sets down no universal rule for determining whether two drugs are "different" for the purposes of the Orphan Drug Act. That responsibility is statutori-

ly imposed on the FDA. Until the FDA endeavors to meet that obligation, the courts will be forced to make case-by-case determinations based on the broad policies embodied in the Act. An appropriate Order accompanies this Memorandum Opinion.

### ORDER

This matter is before the Court on the motions for partial summary judgment of plaintiff Genentech, Inc., intervenor-defendant Ares–Serono, Inc., and intervenor-plaintiffs Nordisk Gentoffe A/S and Nordisk–U.S.A. For the reasons set forth in the accompanying Memorandum Opinion, upon consideration of the motions, the oppositions thereto, and the entire record it hereby is

ORDERED, that the motions for partial summary judgment are denied. It hereby further is

ORDERED, that plaintiff Genentech, Inc.'s pending motion for a preliminary injunction is denied without prejudice.

SO ORDERED.

---

**26.** The court also rejects two arguments advanced by movants which, if adopted, would represent amendment of the Orphan Drug Act through judicial fiat. First, movants contend that designation of Humatrope violates the spirit of the Act by granting orphan drug benefits to a profitable drug. This possibility was explicitly considered—and accepted—in 1984 when the definition of rare disease or condition was amended to include all diseases afflicting fewer than 200,000 people in the United States. *See supra* note 8. This Court does not sit to judge the wisdom of that policy choice. Second, movants argue that the Humatrope designation violates the spirit of the Act by granting benefits to a manufacturer that did not rely on the Act's incentives when deciding whether to invest in new drug development. Consequently, movants assert that Congress did not intend for Lilly to profit from orphan drug designation. To accept movants' argument, however, would be to write into the Act an effective date that Congress chose not to impose; Congress chose to make orphan drug benefits available immediately. The Court declines movants' invitation to impose an additional condition on the receipt of benefits under the Act.