Garry **PENNINGTON**, Plaintiff,

v.

William **PENNER**, et al., **Defendants.**

No. 01–4021–SAC.

United States District Court, D. Kansas.

May 9, 2002.

Lee R. Barnett, Keith E. Renner, Barnett & Renner, PA, Auburn, KS, Kenneth D. Winford, Tenth Judicial District Public Defender, Olathe, KS, for Plaintiff.

David S. Brake, Patrick R. Hrenchir, Henshall, Pennington & Brake, Chanute, KS, Michael T. Jilka, Wendell F. Cowan, Jr., Shook, Hardy & Bacon L.L.P., Overland Park, KS, for Defendants.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

The case comes before the court on the motion to dismiss (Dk. 6) filed by the defendants, Linus Thuston and the Board of County Commissioners of Neosho County, Kansas, and the motion to dismiss (Dk. 8) filed by the defendants, William Penner, L. ("Larry") Roberts, and the City of Chanute, Kansas. This case arises out of an investigation and prosecution of the plaintiff for cruelty to his horses and the eventual seizure of his horses as a result of those efforts. Claiming violations of his rights under the Fourth and Fourteenth Amendment, the plaintiff brings this action pursuant to the federal civil rights statute, 42 U.S.C. § 1983. The plaintiff also asserts several state law claims relying on the court's supplemental jurisdiction. The plaintiff has filed memoranda opposing both motions to dismiss, and the defendants have filed their respective reply memoranda.

## RULE 12(B)(6) STANDARDS

A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Dismissal should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir.1997) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)), or unless an issue of law is dispositive, *Neitzke v. Williams*, 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). "The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir.1993); *see Hospice of Metro Denver, Inc. v. Group Health Ins. of Oklahoma*, 944 F.2d 752, 753 (10th Cir.1991) ("Dismissal of a case pursuant to Fed. R.Civ.P. 12(b)(6) requires the legal determination that the plaintiff can prove no set of facts in support of his claim to entitle him to relief." (citations omitted)). The Tenth Circuit has observed that the federal rules " 'erect a powerful presumption against rejecting pleadings for failure to state a claim.' " *Maez v. Mountain States Tel. and Tel., Inc.*, 54 F.3d 1488, 1496 (10th Cir.1995) (quoting *Morgan v. City of Rawlins*, 792 F.2d 975, 978 (10th Cir. 1986)).

Although a plaintiff need not precisely state each element of his claims, he must plead minimal factual allegations on those material elements that must be proved. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir.1991). Put another way, " 'conclusory allegations without supporting allegations are insufficient to state a claim.' " *Erikson v. Pawnee County Bd. of County Com'rs*, 263 F.3d 1151, 1154 (10th Cir. 2001) (quoting *Hall*, 935 F.2d at 1110), *cert. denied*, —— U.S. ——, 122 S.Ct. 1438, 152 L.Ed.2d 382 (2002). "[A]llegations of conclusions or opinions are not sufficient when no facts are alleged by way of the statement of the claim." *Bryan v. Stillwater Board of Realtors*, 578 F.2d 1319, 1321 (10th Cir.1977); *see Bryson v. City of Edmond*, 905 F.2d 1386, 1390 (10th Cir.1990) (district court is not required to accept "footless conclusions of law" in deciding motion to dismiss). " 'It is true that the Federal Rules of Civil Procedure do not require a plaintiff to set out in detail the facts upon which a claim is based. Nevertheless, a plaintiff must allege sufficient facts to outline a cause of action, proof of which is essential to recovery.' " *Stevens v.*

*Umsted,* 131 F.3d 697, 700 (7th Cir.1997) (quoting *Ellsworth v. City of Racine,* 774 F.2d 182, 184 (7th Cir.1985), *cert. denied,* 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986)).

Nor is it the court's function "to weigh potential evidence that the parties might present at trial." *Miller v. Glanz,* 948 F.2d 1562, 1565 (10th Cir.1991). Rather, a court judges the sufficiency of the complaint accepting as true all wellpleaded facts, *Maher v. Durango Metals, Inc.,* 144 F.3d 1302, 1304 (10th Cir.1998), and drawing all reasonable inferences from those facts in favor of the plaintiff. *Witt v. Roadway Express,* 136 F.3d 1424, 1428 (10th Cir.), *cert. denied,* 525 U.S. 881, 119 S.Ct. 188, 142 L.Ed.2d 154 (1998). These deferential rules, however, do not allow the court to assume that a plaintiff "can prove facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged." *Associated General Contractors v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (footnote omitted). Dismissal is a harsh remedy to be used cautiously so as to promote the liberal rules of pleading while protecting the interests of justice. *Cayman Exploration Corp. v. United Gas Pipe Line Co.,* 873 F.2d 1357, 1359 (10th Cir.1989).

## COMPLAINT

### Allegations of Facts

Because the plaintiff's detailed complaint contains at least 117 paragraphs of factual allegations, the court will provide only a brief outline of the more significant events alleged there. Within the limits of the City of Chanute, Kansas, the plaintiff Garry Pennington rented approximately twelve and one-third acres on which he kept a herd of Paso Finos horses for breeding and raising. At all times material to this case, his herd was no more than sixteen horses. William Penner is an animal control officer for the City of Chanute, and Larry Roberts is a police officer for the City. Linus Thuston is the county attorney for Neosho County, Kansas.

Upon complaints from citizens associated with a group known as International Generic Horse Association and HorseAid ("HorseAid"), Officer Penner accompanied by two members of HorseAid went upon the plaintiff Pennington's property in February of 1998 to inspect the care and condition of the horses. Later that month, Pennington received a letter from Officer Penner with instructions on caring for his dogs and horses. No citations were issued, and no other apparent action was taken against Pennington during the next year.

Between April 28, 1999, and May 11, 1999, Officer Penner visited the plaintiff's property every day to check on the horses' condition. It was two months later when Penner again returned to inspect the horses, and on July 26, 1999, accompanied by three members of HorseAid, Penner inspected and videotaped the condition of the plaintiff's herd. That same day, Penner showed the videotape recording to Neosho County Attorney Thuston. The plaintiff alleges that Thuston, after viewing the videotape, "ordered the seizure of plaintiff's horses" and "authorized the horses' placement with" these members of HorseAid. Later that afternoon, Penner called the veterinarian, Dr. Montfort, to inspect the horses immediately while he and the others waited at the plaintiff's property. When Pennington came to his leased property, Penner told him that the horses had been seized at the County Attorney's direction, that Pennington would be charged with cruelty to animals, that the charges would be filed the next day, and that he was not allowed to come upon his leased property. Upon Dr. Monfort's arrival, the plaintiff left his property and

the others who were there inspecting his horses.

County Attorney Thuston arrived on the scene shortly after Dr. Montfort. Thuston walked around the plaintiff's property and inspected the dog pens. After looking over the herd, Dr. Montfort advised Thuston and others that he "saw no evidence of intentional cruelty or abuse, nor were any horses in a condition that was not recoverable with improved care." (Dk. 1, ¶ 31). Later that evening, the plaintiff returned to his property and learned that Thuston and Penner had heard Dr. Montfort's report on the herd's condition and his recommendation against seizing the horses. Attorney Thuston and Officer Penner, however, were not persuaded by Dr. Montfort's opinion because he had provided veterinarian services for the plaintiff on prior occasions and appeared to be biased in favor of the plaintiff.

The next morning on July 27, 1999, the plaintiff went to the county attorney's office and met with Thuston and Penner. Thuston explained to Pennington that criminal charges were being prepared and asked the plaintiff if he wanted counsel to be present during their meeting. The plaintiff apparently did not ask for counsel but did inquire about what he could do to resolve this situation. Thuston responded that the plaintiff's surrender of all his horses would end the matter. The plaintiff summarily alleges in his complaint that "under the duress and coercion caused by the witch-hunt mentality that prevailed in the county prosecutor's office and the very real fear of unwarranted criminal prosecution, possible loss of his job and public humiliation if he resisted, he agreed to the surrender of his Paso Finos herd which he had been developing for fourteen years." (Dk.1, ¶ 43). By reason of this agreement, Thuston told the plaintiff that no charges would be pressed and that the matter would be kept confidential so long as the

plaintiff surrendered his horses. Thuston further agreed to allow the plaintiff to keep two mares and their foals and to complete his sale of one mare and foal, but he refused the plaintiff's request to keep the stallion. Before the meeting was over, the plaintiff was given animal surrender forms and told he would have five days notice before the animals were removed.

On the afternoon of July 28, 1999, Penner accompanied by a veterinarian and a HorseAid member went to the plaintiff's property and took one of the stallions to the veterinarian's clinic. Penner eventually placed the horse in the care of a HorseAid member. Later that night, Penner went by the plaintiff's house and demanded that the plaintiff sign the surrender forms for the horses. Penner said if the forms were not signed and delivered to his office the next morning then criminal charges would be filed and prosecuted. Penner further warned the plaintiff that he or his family members would be criminally prosecuted if they interfered with HorseAid members' efforts to care for the horses on the plaintiff's property.

On the morning of July 29, 1999, the plaintiff had the signed surrender forms delivered to Penner's office and turned over to Penner's supervisor. Nevertheless, Penner printed out a complaint against the plaintiff later that morning. It laid out the history of complaints received that the horses "were neglected, in poor condition, wormy and hungry" and further observed that Penner believed the complaints were valid. (Dk.1, ¶ 61).

During the day on July 29, 1999, the plaintiff discovered that the local newspaper had learned about his surrender of the horses and that a local saddle club had been asked to assist the HorseAid group with removing the plaintiff's horses that same evening. The plaintiff went to his attorney who attempted to contact Thu-

ston and Penner on the afternoon of July 29, 1999. When he could not reach them, the attorney spoke with the City Attorney David Brake. The plaintiff's attorney "suggested that, while the plaintiff was not terminating any previously made agreement, a better suggestion, under the circumstances would be to allow the plaintiff to dispose of his horses himself under a specific time table." (Dk.1, ¶ 69). After speaking with Penner about this proposal, the city attorney called back the plaintiff's attorney and said that Penner and the City were agreeable to this revision. The plaintiff's attorney responded that he would speak with his client about confirming this change and then would telephone the city attorney the next morning. That night the HorseAid and saddle club members still came to the plaintiff's property to remove the horses, but the plaintiff's attorney called the city attorney who halted the removal of the horses.

The next morning on July 30, 1999, the plaintiff's attorney telephoned the city attorney with news that his client had accepted the revision provided he also could keep a stallion. The city attorney said he had no objection to the plaintiff's additional condition and would have Penner contact the plaintiff's attorney. Shortly before noon on July 30th, the city attorney, however, called the plaintiff's attorney and said that Penner and Thuston would be proceeding with the seizure and prosecution and that plaintiff's attorney should contact Thuston hereafter regarding this matter.

Less than hour later, a criminal complaint signed by an Assistant Neosho County Attorney was filed charging the plaintiff with a misdemeanor offense of unlawful and intentional failure to provide food, potable water and other care needed for the health and well-being of an animal in violation of K.S.A. 21–4310. The complaint was supported by affidavits pre-pared by Officer Penner and a City of Chanute Police Officer Larry Roberts. Thuston directed his assistant county attorney to file the criminal complaint. An arrest warrant was issued and served on the plaintiff at his place of employment. Without a hearing, the district court issued a temporary order pursuant to K.S.A. 21–4311 which placed all of the plaintiff's horses into the custody of HorseAid. A newspaper article on July 31, 1999, quoted Thuston as saying "I made one offer, and one offer only. That was the only offer that was going to be considered." (Dk.1, ¶ 97).

The District Court of Neosho County, Kansas, entered a journal entry on September 30, 1999, with the following findings:

> The defendant [Pennington] entered into an agreement on July 27, 1999 with Linus Thuston, Neosho County attorney and the Chanute Animal control Officer that he would surrender to the City of Chanute all of the horses which he owned and which were then located in his pasture at Cherry & Plummer in the City of Chanute but would retain two mares and their colts and a third mare and colt which had been sold to a third party under contract of sale. The County Attorney agreed that Defendant would not be prosecuted in exchange for the surrender of the horses.

> Defendant's motion to dismiss should be granted based upon the agreement and the charges filed against the defendant should be dismissed with prejudice. The horses, which the Defendant agreed to surrender, should be set over to the City of Chanute in accordance with the agreement.

(Dk.1, ¶ 109). The court further ordered that the plaintiff retained ownership of the three mares and colts and that the remaining horses became the property of the City of Chanute. On October 8, 1999, the de-

fendant Penner along with HorseAid members took the plaintiff's horses pursuant to the court order.

### Claims

Fourth Amendment. The plaintiff claims that the defendant Penner unlawfully entered upon his property without a warrant and without the plaintiff's permission and illegally searched his property. Without legal justification and authority, the defendant Penner ordered the seizure of the plaintiff's property and then seized it in violation of the plaintiff's constitutional rights. The plaintiff further alleges that Penner conducted these unreasonable searches and seizures as the City's chief animal control officer with the knowledge and consent of his superiors and that, as a result, these actions constitute the official policy, custom, practice and/or usage of City of Chanute, Kansas.

The plaintiff claims that on at least one occasion the defendant Thuston unlawfully entered upon his property without a warrant and without the plaintiff's permission and illegally searched his property. Without legal justification and authority, the defendant Thuston ordered the seizure of the plaintiff's property and then had it seized in violation of the plaintiff's constitutional rights. The complaint further alleges that Thuston was not performing the traditional functions of a prosecutor when he unlawfully searched and seized the plaintiff's property. The plaintiff also alleges that Thuston's actions are the official actions of Neosho County, Kansas, as its chief prosecuting official.

Procedural Due Process. The plaintiff claims the defendants seized his property without providing notice and an opportunity to be heard at a meaningful time.

Substantive Due Process. The plaintiff claims the defendants Thuston, Penner and Roberts initiated the prosecution in violation of the plaintiff's substantive due process rights by exercising their power in an arbitrary and oppressive manner that shocks the conscience and/or interferes with rights implicit in ordered liberty. Specifically, the plaintiff claims that the defendant Roberts provided false and misleading information in his affidavit, failed to verify the truthfulness of the facts to which he swore, and failed to disclose in his affidavit not only the basis of his personal knowledge on which he relied in opining there was probable cause but also the grounds for relying on certain people as reliable and credible. The plaintiff similarly claims that defendant Penner's affidavit provided false and misleading information and omitted material facts.

As for the defendant Thuston, the plaintiff alleges the county attorney failed to provide exculpatory evidence to the court when he initiated the criminal prosecution, failed to disclose that he was a witness to the facts relevant in this proceeding, and failed to inform the court that he had already seized the plaintiff's property. The plaintiff further claims that Thuston and Penner breached their immunity agreement when they prosecuted him and failed to keep confidential the seizure of the plaintiff's horses. The plaintiff also accuses Thuston and Penner of unjustifiably threatening him with criminal prosecution if he did not surrender his herd of horses.[1]

---

1. The plaintiff relies on the same events to assert multiple claims for relief. The individual defendants seek dismissal on immunity grounds and governmental defendants seek dismissal for lack of allegations to sustain their liability. The parties primarily organized their briefs based on the defenses commonly asserted rather than the particular claims and legal theories alleged. Because of the sheer number of claims, the court will take the same approach.

## THUSTON'S AND COUNTY'S MOTION TO DISMISS (Dk. 6).

Thuston contends absolute immunity forecloses the plaintiff's substantive due process claim for the county attorney's decision and actual initiation of the criminal prosecution. Arguing that the seizures of the plaintiff's horses "took place under the auspices of the agreement negotiated between Thuston and Plaintiff," the defendant Thuston believes absolute immunity bars the plaintiff's procedural due process and Fourth Amendment claims as the seizures were taken either pursuant to plea negotiations or to a court order. In asserting absolute immunity for his visit to the leased property, Thuston insists his decision to prosecute had. been made upon viewing the videotape and that his subsequent visit to the property was only to evaluate the evidence before charging the plaintiff or negotiating a plea with him. Alternatively, Thuston asserts the protection of qualified immunity and the plaintiff's failure to allege facts sufficient to establish an illegal search. Thuston further claims Eleventh Amendment immunity for the claims brought against him in his official capacity. Thuston argues the court should either decline to exercise supplemental jurisdiction over the state law claims or find them barred on other grounds. Neosho County seeks dismissal as Thuston's actions are not attributable to the Board of County Commissioners.

The plaintiff maintains Thuston is not entitled to absolute immunity for acting as an investigator or a witness or "for acting completely outside of the legal process in seizing animals." (Dk. 29, p. 5). "Thuston stepped out of his role as prosecutor and into the role of an investigating police officer when he entered upon Pennington's property, conducted an investigation, ordered the horses seized based upon his investigation, and by becoming a complaining witness." *Id.* at p. 6. The plaintiff contends the open fields doctrine does not permit officers to occupy the open fields for extended periods in their search, to invite others upon the property and to seize property while there, all without a warrant. As for the actions purportedly taken pursuant to the immunity agreement, the plaintiff argues that it was a nullity as Thuston never intended to abide by it and immediately breached it and that Thuston's actions, therefore, were not taken as a prosecutor. "[S]eizing horses is not a function of a prosecutor." (Dk. 29, p. 10). The plaintiff further contends that Thuston first seized the horses through his oral directives and that this occurred prior to any negotiated immunity agreement with Pennington. To the extent that the county attorney is relying on K.S.A. 21–4311 for authority, the plaintiff challenges the constitutionality of this state statute on procedural due process grounds. The plaintiff maintains the defendant Thuston cannot escape liability on qualified immunity grounds, as he violated clearly established law. The plaintiff denies that Eleventh Amendment immunity protects Thuston from being sued in his individual capacity. The plaintiff clarifies that his abuse of process claim does not name Thuston as a defendant and that his fraud claim was based on Thuston's fraudulent use of the plea agreement to seize the plaintiff's herd. Finally, the plaintiff concedes that his defamation claim against Thuston is untimely and that Neosho is not a proper party, and he moves to dismiss both.

### Absolute Immunity

In *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), the Supreme Court recognized a rule of absolute immunity when a prosecutor's activities are "intimately associated with the judicial phase of a criminal process." In concluding in *Imbler* that a prosecutor in

"initiating a prosecution and in presenting the State's case" was absolutely immune, the Supreme Court "did not attempt to describe the line between a prosecutor's acts in preparing for those functions, some of which would be absolutely immune, and his acts of investigation or 'administration,' which would not." *Buckley v. Fitzsimmons*, 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993) (citation omitted).

In *Burns v. Reed*, 500 U.S. 478, 492, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991), the Supreme Court upheld absolute immunity for a prosecutor's role in applying for a search warrant and presenting evidence in support of it. In *Buckley*, the Court reiterated:

> We have not retreated, however, from the principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made.

509 U.S. at 273, 113 S.Ct. 2606. Most recently in *Kalina v. Fletcher*, 522 U.S. 118, 129, 118 S.Ct. 502, 139 L.Ed.2d 471 (1997), the Supreme Court held that the prosecutor's activities in preparing and filing an information and motion for an arrest warrant were protected by absolute immunity.

■ In the above cited cases, the Supreme Court also held that the defense of absolute immunity is unavailable to a prosecutor for actions taken in other than an advocacy role. When giving legal advice [2] to police, a prosecutor is not performing a function closely associated with the judicial process and is protected only by qualified immunity. *Burns*, 500 U.S. at 492–96, 111 S.Ct. 1934. When holding a press conference or when allegedly fabricating evidence during the preliminary investigation of an unsolved crime, a prosecutor is not acting as an advocate and is protected only by qualified immunity. *Buckley*, 509 U.S. at 275–78, 113 S.Ct. 2606. When personally attesting to the truthfulness of statements included in a certification, a prosecutor is not acting as an advocate but as a complaining witness. *Kalina*, 522 U.S. at 129–31, 118 S.Ct. 502.

■ Evident from these holdings is that the absolute immunity extended to prosecutors "is not grounded in any special 'esteem for those who perform these functions, and certainly not from a desire to shield abuses of office, but because any lesser degree of immunity could impair the judicial process itself.'" *Kalina*, 522 U.S. at 127, 118 S.Ct. 502 (quoting *Malley v. Briggs*, 475 U.S. 335, 342, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). Consequently, as first established in *Imbler*, it is the nature of the function being performed and not the mere identity of the person as a prosecutor that determines whether absolute immunity exists. *Kalina*, 522 U.S at 127, 118 S.Ct. 502; *Buckley*, 509 U.S. at 273, 113 S.Ct. 2606. If a prosecutor's activities are within the function of an officer of the court or an advocate, then absolute immunity prevails. *Buckley*, 509 U.S. at 273,

---

**2.** The plaintiff's § 1983 suit in *Burns* challenged the prosecutor's acts of: "(1) giving legal advice to the police on the propriety of hypnotizing a suspect and on whether probable cause existed to arrest that suspect, and (2) participating in a probable-cause hearing." *Buckley v. Fitzsimmons*, 509 U.S. 259, 270, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). The Supreme Court in *Burns* recognized absolute immunity for the prosecutor's participation in the judicial proceeding but denied the same immunity for giving legal advice to the police. 500 U.S. at 492–96, 111 S.Ct. 1934.

113 S.Ct. 2606. On the other hand, "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Id.* (citation omitted). Thus, whether a prosecutor benefits from absolute or qualified immunity depends on the particular actions or conduct being challenged. *See Kalina,* 522. U.S. at 125–29, 118 S.Ct. 502. "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns v. Reed,* 500 U.S. at 486, 111 S.Ct. 1934.

■ Prosecuting attorneys are absolutely immune from suit under § 1983 for decisions to prosecute, *Hammond v. Bales,* 843 F.2d 1320, 1321 (10th Cir.1988); to not prosecute, *Dohaish v. Tooley,* 670 F.2d 934, 938 (10th Cir.), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982); and for any related investigatory or evidence gathering functions undertaken in connection with the prosecutorial function. *See Scott v. Hern,* 216 F.3d 897, 909 (10th Cir.2000) (prosecutor's immune conduct includes investigation, or lack thereof). "There is no question in this circuit that prosecutors are absolutely immune from liability for allegedly failing to conduct an adequate, independent investigation of matters referred to them for prosecution." *Scott v. Hern,* 216 F.3d at 909 (citation omitted).

■ There is no serious debate that Thuston's decision to prosecute Pennington, as well as his actions taken to initiate and pursue this prosecution, are protected by absolute immunity. The court will not reduce all of Thuston's actions to an investigator or a mere complaining witness only because he paid a single visit to the plaintiff's property. Instead, the circumstances surrounding his one visit to the property demonstrate that Thuston went there simply to perform investigatory or evidence-gathering functions related to his "preparation for the initiation of a prosecution or for judicial proceeding." *See Buckley,* 509 U.S. at 273, 113 S.Ct. 2606. As alleged in the complaint, Thuston only visited the property after having seen the videotape, having decided that prosecutorial action was appropriate, and having directed others to take the necessary steps in pursuit of that prosecution and in protection of the herd. "There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand." *Id.* Because Thuston already had been provided the cause and grounds to initiate the prosecution based on the videotape, his mission in visiting the property was not as an investigator but as an advocate.[3] *Id.* at 274, 113 S.Ct. 2606.

**3.** Even assuming Thuston's search of the plaintiff's herd did not come within his prosecutorial function, the court still would grant the defendant's motion based on the open fields doctrine and the plaintiff's failure to allege a Fourth Amendment violation. As first stated in *Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924), and reaffirmed in *Oliver v. United States,* 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), the Supreme Court has recognized the open fields doctrine, that is, officers' entry and search of an open field without a warrant "is not one of those 'unreasonable searches' proscribed by the text of the Fourth Amendment." *Oliver,* 466 U.S. at 177, 104 S.Ct. 1735. Any asserted expectation of privacy in open fields is not one that "'society recognizes as reasonable.'" *United States v. Lewis,* 240 F.3d 866, 871 (10th Cir.2001) (quoting *Oliver,* 466 U.S. at 179, 104 S.Ct. 1735). Unable to establish an expectation of privacy, the plaintiff cannot claim a Fourth Amendment violation because of the government's search.

In *Kalina,* the Supreme Court reaffirmed that all of the following matters call for a prosecutor's "exercise of professional judgment," "the determination that the evidence was sufficiently strong to justify a probable-cause finding," the "decision to file charges," the "presentation of the information" to the court, the "drafting of the certification" and "even the selection of the particular facts to include in the certification to prove the evidentiary support for the finding of probable cause." 522 U.S. at 130, 118 S.Ct. 502. Indeed, "the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom." *Imbler,* 424 U.S. at 431, n. 33, 96 S.Ct. 984. Thus, Thuston is entitled to absolute immunity for his prosecutorial actions in reviewing and evaluating the evidence found in the reports, videotapes and witness statements, in determining that the evidence was sufficient to support a finding of probable cause, and in deciding to file charges.[4] That Pennington accuses Thuston of having improper or malicious motives "is of no consequence, for absolute immunity provides complete protection from judicial scrutiny of the motives for the prosecutors' actions." *Ireland v. Tunis,* 113 F.3d 1435, 1447 (6th Cir.), *cert. denied,* 522 U.S. 996, 118 S.Ct. 560, 139 L.Ed.2d 401 (1997).

"A prosecutor's withholding of evidence is an action 'intimately associated' with the judicial process." *Powell v. Spear,* 6 Fed.

Appx. 739, 2001 WL 276822, at *2 (10th Cir.2001) (Table); *see also Robinson v. Volkswagenwerk AG,* 940 F.2d 1369, 1373 n. 4 (10th Cir.1991) ("Whether the claim involves withholding evidence, failing to correct a misconception or instructing a witness to testify evasively, absolute immunity from civil damages is the rule for prosecutors."), *cert. denied,* 502 U.S. 1091, 112 S.Ct. 1160, 117 L.Ed.2d 408 (1992). In passing on or withholding facts he may have learned from watching the videotape, from later inspecting the herd for himself, or from negotiating an immunity agreement with Pennington, Thuston was still acting as an advocate when he gathered that information and when he conveyed or withheld that information to the court.

A prosecutor's absolute immunity extends to conduct surrounding plea negotiations. *See Worthington v. Welch,* No. 93–3216–DES, 1993 WL 266455, at *1 (D.Kan. June 2, 1993) (citing *Taylor v. Kavanagh,* 640 F.2d 450 (2nd Cir.1981)); *Arnold v. McClain,* 926 F.2d 963 (10th Cir.1991). The plaintiff essentially alleges that Thuston was not acting as an advocate when he used coercion to secure the plaintiff's participation in the immunity agreement and when he represented to the plaintiff that no charges would be filed while never intending to bind the State to any such agreement. Coercive or not, Thuston's offer and comments "were akin to plea bargaining, an activity that is abso-

---

4. Other than walk around the plaintiff's property and evaluate what he had already seen on the videotape, the plaintiff fails to allege with specificity what Thuston did strictly in an investigative capacity that cannot be said to be related to his preparation for the initiation of a prosecution. In the court's judgment, Thuston's actions qualify as nothing more than the prosecutor's exercise of professional judgment in reviewing and evaluating the evidence and in deciding whether to initiate a prosecution. All of this work was done in Thuston's capacity as an advocate for the

State and "was integral to the initiation of the prosecution." *Kalina,* 118 S.Ct. at 509; *see Ireland v. Tunis,* 113 F.3d at 1447 ("Absolute prosecutorial immunity will likewise attach to administrative or investigative acts necessary for a prosecutor to initiate or maintain the criminal prosecution." (footnoted omitted)). Indeed, there is nothing to indicate that Thuston was acting outside his authority and professional judgment as an advocate for the State in evaluating the evidence and filing the criminal charge.

lutely immune from liability due to its intimate association with the judicial process." *Pfeiffer v. Hartford Fire Ins. Co.*, 929 F.2d 1484, 1492 (10th Cir.1991). Immunity attaches to the activity or function and is not dependent on the manner in which it is performed or the motive behind it. *Parkinson v. Cozzolino*, 238 F.3d 145, 150 (2nd Cir.2001). That the plaintiff alleges Thuston had an improper motive for negotiating and obtaining an immunity agreement with him " 'is of no consequence, for absolute immunity provides complete protection from judicial scrutiny of the motives for the prosecutors' actions.' " *Van Deelen v. City of Eudora, Kan.*, 53 F.Supp.2d 1223, 1229 (D.Kan. 1999) (quoting *Ireland v. Tunis*, 113 F.3d at 1447).

■ The plaintiff alleges in his complaint that Thuston seized his horses on July 26th by verbally ordering the same. There is no allegation in the complaint that Thuston had the horses actually removed on July 26th or that Thuston's verbal order meaningfully interfered with the plaintiff's possessory interests in the herd. A seizure of property "occurs when 'there is some meaningful interference with an individual's possessory interests in that property.' " *Soldal v. Cook County*, 506 U.S. 56, 61, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984)). Nor has the plaintiff presented the facts or the law to conclude that the mere threat to take action so interfered with the plaintiff's possessory interest as to constitute a seizure. *See, e.g., Newsome v. Erwin*, 137 F.Supp.2d 934, 940 n. 5 (S.D.Ohio 2000) ("[A] mere 'threat to do an act prohibited by the Constitution' is not 'equivalent to doing the act itself.' ") (quoting *Gaut v. Sunn*, 810 F.2d 923, 925 (9th Cir.1987)). In short, the complaint does not allege any factual basis for finding a meaningful interference with the plaintiff's possessory interests in the horses until the stallion was actually removed on July 28, 1999, and more horses were removed on October 8, 1999.

■ The July 28th seizure occurred after Thuston and the plaintiff had entered into the immunity or plea agreement.[5] The plaintiff does not refute Thuston's argument that this seizure took place under the auspices of this agreement and that Thuston's actions taken in association with this agreement fall within the prosecutorial function protected by absolute immunity. The later seizure on October 8th was pursuant to a court order, and Thuston functioned solely as a prosecutor in securing that order and having it executed. Thus, absolute immunity bars the plaintiff's claims for unlawful seizure on these dates.

In sum, the court concludes the plaintiff's federal law claims against Thuston are brought for his actions taken in pursuit of his prosecutorial function and, thus, are barred by Thuston's absolute immunity.

Claims against Neosho County, Kansas

The plaintiff concedes Neosho County, Kansas, is not a proper party to this case and moves to dismiss it. The court grants the plaintiff's request to dismiss Neosho County from the case.

---

**5.** As the complaint alleges at ¶ 109, the District Court of Neosho County, Kansas, found in an order filed September 30, 1999, that the plaintiff Pennington and Linus Thurston entered into an agreement on July 27, 1999, that provided the plaintiff would surrender all of his horses except for three mares and colts to the City of Chanute in exchange for Thuston's promise not to prosecute the plaintiff. As a result of this finding, the state district court dismissed with prejudice the criminal charges later filed against Pennington and ordered Pennington to surrender his horses.

## MOTION TO DISMISS OF WILLIAM PENNER, L. ROBERTS, and CITY OF CHANUTE, KANSAS (Dk. 8)

### Qualified Immunity

" '[O]fficials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Johnson v. Fankell,* 520 U.S. 911, 914–15, 117 S.Ct. 1800, 138 L.Ed.2d 108 (1997) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). This defense shields officials from "the burdens of broad-ranging discovery," *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727, when dismissal on the pleadings is appropriate, and from the burdens of trial as well as liability "when evidence fails to uncover evidence sufficient to create a genuine issue," *Johnson,* 520 U.S. at 915, 117 S.Ct. 1800.

Once a defendant asserts a defense of qualified immunity, the "court must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Conn v. Gabbert,* 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999) (citations omitted). The issue of "whether the plaintiff has asserted a violation of a constitutional right at all" is a "purely legal question." *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277, (1991). If the complaint states a cognizable federal claim, the court should proceed to examine whether the right was clearly established at the time of the challenged conduct. This is also a question of law. *See, e.g.,*

*Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. 2727 (district court may appropriately determine on summary judgment "not only the currently applicable law, but whether that law was clearly established at the time an action occurred").[6] "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City and County of Denver,* 960 F.2d 1493, 1498 (10th Cir.1992).

"In the context of a 12(b)(6) motion to dismiss, ... the qualified immunity defense is limited to the pleadings," and "the allegations in the complaint and any reasonable inferences ... from them" are drawn in favor of the plaintiff. *Dill v. City of Edmond, Okl.,* 155 F.3d 1193, 1203–04 (10th Cir.1998). In the past, the Tenth Circuit has required a plaintiff to meet a heightened pleading standard upon a defendant's assertion of qualified immunity. *Currier v. Doran,* 242 F.3d 905, 911 (10th Cir.), *cert. denied,* —— U.S. ——, 122 S.Ct. 543, 151 L.Ed.2d 421 (2000). The Tenth Circuit in *Currier* held, however, that this heightened pleading requirement does not survive the Supreme Court's opinion in *Crawford–El v. Britton,* 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). 242 F.3d at 916. While accepting that its review is now limited to the customary 12(b)(6) standards, the Tenth Circuit observed that the Supreme Court recognized a trial judge's discretion to "require a plaintiff to plead 'specific, nonconclusory factual allegations' to survive a prediscovery motion for dismissal." 242 F.3d at 916 (quoting *Crawford–El,* 523 U.S. at 598, 118 S.Ct. 1584).[7] When faced with this re-

---

6. "If the defendant's conduct as alleged by the plaintiff does not violate the law, we need not reach the issue of whether the law was clearly established." *Clanton v. Cooper,* 129

F.3d 1147, 1153–54 (10th Cir.1997) (citation omitted).

7. The Supreme Court more fully explained that prior to permitting discovery on a claim

quirement, the plaintiff "may amend his complaint to include additional 'specific, non-conclusory allegations of fact' sufficient to allow the district court to determine whether Defendants are entitled to qualified immunity." *Dill v. City of Edmond, Okl.,* 155 F.3d at 1204.

### DEFENDANT L. ROBERTS

In his brief opposing dismissal, the plaintiff summarizes his complaint against L. Roberts as alleging that the officer signed an affidavit that was insufficient to support a prosecution, that he averred to what he only observed from the videotape, that he never personally inspected the horses or took steps to verify the information or the reliability of witnesses' statements to him, that he failed to disclose to the court his own lack of experience and expertise with horses and the contrary opinion of the veterinarian Dr. Montfort, and that he failed to inform the court about the immunity agreement. These same allegations are found in the plaintiff's complaint as part of his substantive due process claim. (Dk.1, ¶ 152). In relevant part, he alleges that officer Roberts "provided false and misleading information in an affidavit," "failed to personally verify any facts which he swore under oath were true," and "failed to indicate why the people he relied upon for the information contained in the affidavit were reliable and credible." *Id.* He further alleges that officer Roberts' "actions were willful and wanton and were done with a reckless disregard for plaintiff's rights." *Id.* At ¶ 82 of his complaint, the plaintiff alleges with some specificity the misrepresentations

and omissions concerning Roberts' affidavit.

■ The law regarding the submission of false information or the omission of information from affidavits in support of warrants or complaints is clearly established. A plaintiff's rights under the Fourth and Fourteenth Amendments are violated when an officer knowingly or recklessly makes "a false statement in an affidavit in support of an arrest or search warrant, if the false statement were material to the finding of probable cause." *Bruning v. Pixler,* 949 F.2d 352, 357 (10th Cir.1991) (citing in part *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)), *cert. denied,* 504 U.S. 911, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992); *see Breidenbach v. Bolish,* 126 F.3d 1288, 1292 (10th Cir.1997). It is also "clearly established that 'to knowingly or recklessly omit from an arrest affidavit information which, if included, would have vitiated probable cause,' would violate a plaintiff's Fourth and Fourteenth Amendment rights." *Bruning,* 949 F.2d at 357 (quoting *Stewart v. Donges,* 915 F.2d 572, 582–83 (10th Cir.1990)). Recklessness can be proved by evidence that the affiant actually "entertained serious doubts at to the truth of his allegations" or can "be inferred from omission of facts which are clearly critical to a finding of probable cause." *Bruning,* 949 F.2d at 357 (quotations and citations omitted).

■ Because the plaintiff went to great lengths to allege what the defendant Roberts did and did not aver in the affidavit,

---

against a public official involving proof of a wrongful motive, the trial judge had two options with the first being:

First, the court may order a reply to the defendant's or a third party's answer under Federal Rule of Civil Procedure 7(a), or grant the defendant's motion for a more definite statement under Rule 12(e). Thus, the court

may insist that the plaintiff 'put forward specific nonconclusory factual allegations' that establish improper motive causing cognizable injury in order to survive a prediscovery motion for dismissal or summary judgment. (citation omitted).
523 U.S. at 598, 118 S.Ct. 1584.

the court need not stop with the plaintiff's conclusory and ambiguous allegation that Roberts acted "with a reckless disregard for plaintiff's rights." As for the misrepresentations in the affidavit, the complaint does not allege that Roberts knowingly averred false statements or that he seriously doubted the truthfulness of what he had averred. As for the omissions from the affidavit, the complaint does not allege that Roberts omitted any facts from his affidavit which would have been "clearly critical" to a finding of probable cause. Allegations amounting to nothing more than negligence or innocent mistake are insufficient to state a claim. *Beard v. City of Northglenn, Colo.*, 24 F.3d 110, 114 (10th Cir.1994). The plaintiff has not come forth with any clearly established law in support of his allegations that an officer/affiant must investigate the reliability and veracity of a videotape and accompanying statements made by a fellow officer. "The failure to investigate a matter fully, to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence rarely suggests a knowing or reckless disregard for the truth," and "it is generally considered to betoken negligence at most." *Id.* at 116 (quotations and citations omitted). In sum, the court concludes that the plaintiff has failed to allege a constitutional violation by officer Roberts and that he has not shown the law to have been clearly established with regard to an affiant's duty to further investigate the veracity of evidence gathered by fellow officers under circumstances similar to this case. The court grants the defendant Roberts' motion to dismiss on qualified immunity grounds.

### DEFENDANT WILLIAM PENNER

In his brief opposing dismissal, the plaintiff summarizes his complaint against William Penner as alleging that the animal control officer illegally searched the plaintiff's property on numerous occasions, that he removed one of the plaintiff's horses on July 28th, that he threatened and coerced the plaintiff into signing the animal surrender forms, that he made a misleading and inaccurate report leading to criminal charges being filed against the plaintiff, and that Penner filed an affidavit in support of the criminal charges containing misrepresentations and omissions. The plaintiff's brief does not address other allegations against Penner that are found in his complaint. The court considers the plaintiff to have abandoned these other allegations against Penner.

### Illegal Searches

The defendant Penner argues he did not violate any clearly established law when he inspected the plaintiff's herd in light of K.S.A. 21–3411 and the open fields doctrine. The plaintiff challenges the constitutionality of this state statute in authorizing the inspection of his property without proper notice and without limitations to time, place and scope of the search. The plaintiff's cursory arguments do not persuade the court that under clearly established law controlling in this circuit or the clearly established weight of authority from other courts this statute is unconstitutional in authorizing the inspection of any animal "which clearly shows evidence of cruelty to animals, as defined in K.S.A. 21–4310." K.S.A. 21–4311. Even assuming the unconstitutionality of this statute was clearly established, the plaintiff is unable to assert an expectation of privacy in open fields that society would recognize as reasonable under these circumstances. The plaintiff points to no clearly established law that would preclude officers from inspecting in the open field his herd and from bringing along others experienced or trained in evaluating the condition of horses. Unable to show he had a legitimate expectation of privacy in the

open pasture that was searched, the plaintiff has not carried his burden of alleging a violation of clearly established law.

### Removal of Horse on July 28th

The defendant Penner argues this removal of the plaintiff's stallion was "authorized by" the state statute and was "based on the agreement negotiated between the Plaintiff and the Defendants" on July 27th. (Dk. 9, p. 6). The plaintiff Pennington challenges the constitutionality of the state statute and argues his agreement to surrender the horses on July 27th was made under an "atmosphere of coercion and duress" and later breached by the defendants. (Dk. 28, pp. 10–11).

"The removal of an animal constitutes a "seizure" for purposes of the Fourth Amendment, and thus, such a seizure must meet that Amendment's constitutional requirements." *Siebert v. Severino*, 256 F.3d 648, 656 (7th Cir.2001) (citing *Lesher v. Reed*, 12 F.3d 148, 150 (8th Cir.1994)); see *DiCesare v. Stuart*, 12 F.3d 973, 977–78 (10th Cir.1993). "Exigent circumstances may justify a warrantless seizure of animals." *Siebert*, 256 F.3d at 657 (citing *DiCesare*, 12 F.3d at 977). Another exception to a warrantless seizure is voluntary consent. *United States v. Lowe*, 999 F.2d 448, 451 (10th Cir.1993).

■ As alleged in the complaint, Penner and a veterinarian inspected the stallion on July 28th and immediately took the stallion to the veterinarian's clinic for care and treatment. The reasonable inference to be drawn is that the veterinarian was of the opinion the stallion needed additional immediate care that he could not provide at the site. Given these circumstances, a reasonable officer in Penner's position would have believed, mistakenly or not, that exigent circumstances existed to justify the warrantless seizure. *Siebert v. Severino*, 256 F.3d at 658. In addition, the plaintiff's arguments are not persuasive

that under clearly established law controlling in this circuit or the clearly established weight of authority from other courts that the Kansas statute is necessarily unconstitutional in authorizing the seizure of animals under such exigent circumstances.

As also alleged the complaint, the District Court of Neosho County, Kansas, granted Pennington's motion and dismissed the criminal charges against him upon finding that Pennington, Thuston and Penner had entered into an agreement on July 27th for Pennington's surrender of the horses in exchange for Thuston's agreement not to prosecute. It seems a far stretch for Pennington now to challenge the voluntariness of the very agreement which won him the dismissal of the state criminal charges. More importantly, Pennington has not shown any constitutional right here implicated that is so clearly established that a reasonable officer in Penner's position would have understood he was violating it in seizing a horse upon the advice of a veterinarian and after Pennington had consented to the surrender of the herd. The defendant Penner is entitled to qualified immunity on this claim.

### Coercion to Sign Surrender Forms

■ The plaintiff alleges that Penner unjustifiably threatened him with criminal prosecution and otherwise coerced him into signing the surrender forms. The plaintiff, however, does not allege how this conduct violates a constitutional right clearly established at the time. Penner's statement that criminal charges would be filed if Pennington did not surrender his herd does not amount to a constitutional violation. The complaint does not allege Penner's statement to have been fraudulent. That the plaintiff felt threatened by Penner's statement and compelled to sign the surrender forms does not transform

Penner's conduct into a constitutional violation. The plaintiff points to no clearly established constitutional right violated by Penner's alleged conduct.

### Misleading and Inaccurate Report

The plaintiff here alleges that Penner prepared and filed a complaint report on July 29, 1999, that listed the complaining witnesses, including Dr. Mike Thorp, and that said the plaintiff's horses were "neglected, in poor condition, wormy and hungry, and that the complaints were valid." (Dk.1, ¶ 61). The plaintiff further alleges in his complaint that these allegations "were completely contrary to the evaluation of the herd by the independent veterinarian, Dr. Monfort." *Id.* at ¶ 62. The plaintiff does not allege how this report was used in any way to violate his constitutional rights. Nor does he allege that report falsely reported the statements and complaints of the listed witnesses. Merely alleging that Dr. Monfort held an opinion about the condition of the plaintiff's herd different than that held by Dr. Thorp or other witnesses does not state a cognizable federal claim.

### Misrepresentations and Omissions in Affidavit

As stated earlier, the law regarding the submission of false information or the omission of information from affidavits in support of warrants or complaints is clearly established. Knowingly or recklessly making a false statement in an affidavit that is material to the finding of probable cause violates a plaintiff's rights under the *Fourth and Fourteenth Amendments.* In a similar vein, knowingly or recklessly omitting from an affidavit information that would have vitiated probable cause violates the plaintiff's constitutional rights. Recklessness is proved by the affiant having seriously doubted the truth of his allegations or inferred from the affiant's omission of facts plainly critical to a finding of probable cause.

 Like his claim based on the defendant Roberts' affidavit, the plaintiff has alleged in detail his claim for the defendant Penner's omissions from the affidavit. Consequently, the court here looks at whether these specific allegations state a claim for relief. Looking at what he has alleged in the complaint and chosen to brief in his memorandum, the plaintiff does not appear to state any claim that Penner affirmatively misrepresented anything in his affidavit. For that matter, the complaint does not allege that Penner knowingly averred false statements or that he seriously doubted the truthfulness of what he did aver. As for those matters allegedly omitted from the affidavit, the complaint does not allege omissions that would have vitiated probable cause. Though these omissions certainly could have been included in the affidavit and may have been relevant in subsequent proceedings, they were not facts clearly critical to a finding of probable cause. Negligently omitting certain facts or merely overlooking some relatively minor facts is insufficient to state a claim. That certain witnesses may have been charged recently with unrelated criminal offenses, that another veterinarian had expressed less concern over the seriousness of the herd's condition, or that Penner himself did not have much experience with horses are certainly relevant circumstances, but they hardly detract from the probable cause arising from the circumstances that several others, who by training and experience had the expertise to evaluate the herd's condition, had opined to Penner about the serious neglected condition of the herd and that Penner had personally observed the herd over a substantial period of time. In sum, the court believes recklessness cannot be inferred under the circumstances as

they have been alleged in this case. The court grants the defendant Penner's motion to dismiss on qualified immunity grounds.

### City of Chanute, Kansas

■ The plaintiff specifically pleads his § 1983 claims against the City in ¶¶ 132 and 162 of the complaint, where he alleges in pertinent part:

> Defendant Penner was the chief animal control official for the City of Chanute, Kansas, and was conducting these unreasonable searches and seizures with the knowledge and consent of his superior/s, and since such actions were conducted by him as a chief animal control official and were condoned by the officials with supervisory authority over defendant Penner, they constitute the official policy, custom, practice, and.or usage of the City of Chanute, Kansas.

(Dk.1, ¶ 132). "Qualified immunity is not available as a defense to municipal liability." *Seamons v. Snow,* 206 F.3d 1021, 1029 (10th Cir.2000) (citing *Owen v. City of Independence,* 445 U.S. 622, 638, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980)). "A municipality cannot, however, be held liable for the actions of its employees under the theory of respondeat superior." *Id.* (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Municipal liability, instead, arises from proof "that the unconstitutional actions of an employee were representative of an official policy or custom of the municipal institution, or were carried out by an official with final policy making authority with respect to the challenged action." *Id.* (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480–83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality opinion); *Murrell v. Sch. Dist. No. 1,* 186 F.3d 1238, 1248–49 (10th Cir.1999)).

Because the court has found the defendant Penner entitled to qualified immunity

on the illegal search and seizure claims based in part on the plaintiff's failure to allege a constitutional violation, "the City may not be found to have violated his rights." *Butler v. City of Prairie Village, Kan.,* 172 F.3d 736, 747 (10th Cir.1999) (citing *Wilson v. Meeks,* 98 F.3d 1247, 1255 (10th Cir.1996); *Hinton v. City of Elwood, Kan.,* 997 F.2d 774, 782 (10th Cir.1993)). Alternatively, the court finds the plaintiff's allegations, detailed as they are with respect to Penner's conduct, remain insufficient to establish that deliberate municipal action was the moving force behind any constitutional violation. *See Myers v. Okla. County Bd. of County Comm'rs,* 151 F.3d 1313, 1318 (10th Cir.1998) (for municipal liability under § 1983 liability, plaintiff must allege that an employee violated his constitutional rights and that municipal policy or custom was the moving force behind the violation). The City of Chanute is entitled to dismissal of the § 1983 claims against it.

## STATE LAW CLAIMS

Having dismissed the federal claims over which this court has original jurisdiction, the court in the exercise of its statutory discretion declines to assume supplemental jurisdiction over the plaintiff's state law claims against the different defendants. 28 U.S.C. § 1367(c)(3); *see Tonkovich v. Kansas Bd. of Regents,* 254 F.3d 941, 945 (10th Cir.2001). The plaintiff advances no substantial reasons for exercising such jurisdiction. "[G]iven the relative lack of pretrial proceedings—including a total absence of discovery—considerations of 'judicial economy, convenience, fairness' do not favor 'retaining jurisdiction.'" *Tonkovich,* 254 F.3d at 945 (quoting in part *Anglemyer v. Hamilton County Hosp.,* 58 F.3d 533, 541 (10th Cir.1995)). At this juncture, the most common response is to dismiss the state law claims without prejudice. *Roe v. Cheyenne Moun-*

*tain Conference Resort, Inc.,* 124 F.3d 1221, 1237 (10th Cir.1997). The parties have argued no unique circumstances to justify exercising supplemental jurisdiction, and the court finds none.

IT IS THEREFORE ORDERED that the motion to dismiss. (Dk.6) filed by the defendants, Linus Thuston and the Board of County Commissioners of Neosho County, Kansas, is granted;

IT IS FURTHER ORDERED that the motion to dismiss (Dk.8) filed by the defendants, William Penner, L. Roberts and the City of Chanute, Kansas, is granted;

IT IS FURTHER ORDERED that the court declines to exercise supplemental jurisdiction over the remaining state law claims and dismisses the same without prejudice.